UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


JOSEPH RUSHING,                    )
                                   )
            Plaintiff,             )
                                   )
      vs.                          )          Case No. 4:08CV1338 CDP
                                   )
NANCY SIMPSON, et al.,             )
                                   )
            Defendants.            )


# MEMORANDUM AND ORDER

Joseph Rushing brings this *pro se* action under 42 U.S.C. § 1983 alleging

that defendants, staff at the Missouri Sexual Offender Treatment Center

(MSOTC), used excessive force against him in violation of his constitutional

rights and Missouri Department of Mental Health regulations.  Rushing, a former

detainee at MSOTC, claims that defendants used more force than was necessary

when they placed him in a choke-hold to remove him from the dining hall.

Defendants have moved for summary judgment on the basis of qualified immunity,

arguing that their actions in removing Rushing from the dining hall were

objectively reasonable and did not violate Rushing's clearly established

constitutional rights.  I agree.  Defendants are entitled to qualified immunity from

suit, and I will grant their motion for summary judgment.

## Legal Standard

The standards for summary judgment are well settled. In ruling on summary judgment, the Court views the facts and inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in its pleadings but must set forth by affidavit or other evidence specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). At the summary judgment stage, I will not weigh the evidence and decide the truth of the matter, but rather I need only determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

## Background Facts

In February 2008, Joseph Rushing was a detainee at the Missouri Sexual Offender Treatment Center. MSOTC is a facility operated by the Missouri Department of Mental Health. MSOTC holds both residents and detainees. Residents at MSOTC are individuals who have been found to meet the definition of "sexually violent predators" under Mo. Rev. Stat. § 632.480(5) (2008) and who

have been civilly committed for their control, care, and treatment. Detainees are individuals who are awaiting trial to determine whether they meet the definition of a sexually violent predator. Rushing spent four years in the Farmington Correctional Center before coming to MSOTC as a detainee in May 2007. Rushing is no longer detained at MSOTC.

Defendants were employees at MSOTC at the time of their alleged use of excessive force. Defendant Nancy Simpson was a Unit Program Supervisor for Rushing's ward. Defendant Joseph Easter was a Registered Nurse and the Assistant Medical Services Director for MSOTC. Defendants Evan Miller and Larry Major were both Security Aides. Defendants have provided video footage of the dining hall on the day of the alleged assault, and I have reviewed that footage as well as Rushing's deposition testimony. I have accepted the facts as presented by Rushing to be true, except where they are clearly contradicted by the video footage.[1]

Detainees and residents at MSOTC are assigned seats for all meals in the Blair Dining Hall. On February 28, 2008, Rushing was told by a MSOTC staff

---

[1]Where video evidence is available, and where "[t]here are no allegations or indications that [the tape] was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," I should not adopt a contradictory version of the facts presented by the plaintiff. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Here, parts of Rushing's deposition testimony and allegations in his complaint are clearly contradicted by the video footage of the dining hall. In those instances, I will view the facts as they are depicted by the video.

member that his assigned seat had been moved. Rushing informed the staff member that he did not want to change seats because he believed that an individual at his newly assigned table was a racist, and had recently directed racially-charged statements toward him. The staff member told Rushing that she would discuss his concern with defendant Simpson. Rushing claims that he left that conversation with the impression that he was to remain in his previously assigned seat for the time being.

The following morning, on February 29, 2008, Rushing came to the Blair Dining Hall for breakfast. Video footage of the dining area shows that Rushing put his breakfast tray down at a seat at approximately 7:40 a.m. Rushing put his tray down at his normal seat, not his reassigned seat, because Rushing was under the impression that his seat had not been officially changed. At 7:41 a.m., after putting down his tray, Rushing returned to the food area. At that time, he spoke briefly with defendant Simpson, and then returned to his seat. Rushing does not recall having this conversation. About one minute after Rushing sat down and began eating his breakfast, Simpson approached Rushing at his seat and spoke to him. According to Rushing, Simpson told him that he had to go back to the housing unit, but she refused to tell him why. Simpson also told him that he would not be allowed to finish his breakfast. Simpson claims that she told Rushing that he had to move to his new seat, but Rushing disputes this, claiming

that Simpson repeatedly told him to return to the housing unit, but refused to tell him why.[2]  It is undisputed, however, that Rushing told Simpson that he would not return to the housing unit until he had finished his breakfast.

After that conversation, Simpson walked to the entrance door to the dining hall to call security staff to come assist her in the dining hall.  Less than a minute later, she returned to Rushing's table and stood to his right, with her back to the rear wall of the dining area.  At 7:43 a.m., defendant Miller approached Rushing at his table and spoke to him.  About thirty seconds later, defendant Easter approached Rushing and spoke to him.  At 7:45 a.m., defendant Major joined Miller and Easter, and all three defendants stood behind Rushing.  Rushing remained seated.  Defendant Major told Rushing to return to the ward, and Rushing refused, saying that he would not return until he finished his breakfast.  Rushing does not dispute that defendants repeatedly asked him to return to the ward, and he repeatedly refused, insisting that he was going to remain and finish his breakfast.

At 7:46 a.m., Rushing stood up.  Rushing claims that one of the defendants violently removed his chair from underneath him, forcing him to stand, although

_____

[2]Rushing's own exhibits filed in response to defendants' motion for summary judgment refute this statement.  The statement by Timothy Nelson, for example, states that Simpson told Rushing to move to his new seat, and that Rushing refused to move. Statements provided by McCord, Tyson, and Finger corroborate that account.  Rushing's own response to defendants' motion for summary judgment also corroborates Simpson's account that she told Rushing to go to his newly assigned seat.

that is not corroborated by the video footage. Rushing appears to stand up on his own, although defendant Miller may have moved his chair slightly. After standing, Rushing turned to face Miller, Easter, and Major. Rushing recalls telling defendants, "This is bullshit. I just want to eat my food. That's it. I just want to eat, and then I'll go." Rushing spoke with the defendants for about thirty seconds, and then turned back around to eat his food, while still standing. Rushing insisted that he would not return to the ward until he finished his breakfast. He continued to eat his food for about twenty seconds before turning back around to face the three men again. A few seconds later, Rushing turned back around and talked in an animated manner to the other individuals at his table and to Simpson. For about two minutes, Rushing spoke to Simpson and the other residents, with his back turned to Major, Easter, and Miller. Rushing recalls "letting people at the table know" how he felt about being asked to leave. The other individuals sitting at the table began to comment on the situation. Rushing admits that other people at his table began to get upset. Rushing recalls asking people in the dining hall, "Don't you think this is bullshit?" Rushing admits that the other detainees and residents in the cafeteria responded by telling him, and defendants, that they thought it was wrong.

At 7:50 a.m., seven minutes after defendant Miller first approached Rushing, defendant Easter put his arm around Rushing. Rushing claims that this

contact was prompted by Simpson, who told the three men to "take him" or "put him down." At that time, Easter grabbed Rushing's right arm, Miller placed his arm around Rushing's neck from behind, and defendant Major grabbed Rushing's left arm.[3] Moving away from the table as a unit, the four men ran into a table behind them, although it did not collapse, nor did the men fall to the ground. In his complaint and deposition, Rushing claims that the table collapsed, but the video shows that the table was only slightly displaced by the contact. The group moved toward the entrance door and made contact with another table, which, again, did not collapse but was slightly displaced. Rushing claims that he told the men that he was unable to breathe and that he was having an asthma attack. A minute after defendants grabbed Rushing, the group fell to the ground in the area by the food line.

Rushing was on the floor for less than a minute. Rushing claims that he lost consciousness during this time. The group appeared to fall at 7:50:10, and Rushing was standing at 7:50:38, only thirty seconds later. At 7:50:45, Rushing walked over to the nearest table and leaned on it, apparently catching his breath.

---

[3]Defendant Miller denies ever putting Rushing in a choke-hold. Miller claims he put his arm around Rushing's chest, not his neck. However, I must assume, for the purposes of this motion, that Rushing's version of the facts is true, and I cannot tell from the video of the incident exactly where Miller's arm is placed around Rushing. The video of the incident also shows which defendant grabbed which part of Rushing - Rushing claims that Miller grabbed his right arm, Major grabbed his left arm, and Easter had his arm around his neck. The video shows differently, and is corroborated by the affidavits of Miller, Easter, and Major.

Defendant Easter then guided Rushing out of the dining hall. Video footage from the protective isolation room shows Rushing walking into that room, unassisted and on his own feet, at 7:50:55. Rushing was examined by medical personnel about two minutes later. Staff let Rushing catch his breath in the PI room, checked his blood pressure, and brought him his inhaler.

Rushing alleges that defendants used excessive force against him in violation of his constitutional rights and departmental regulations. Rushing has asthma. When Rushing has an asthma attack, he has difficulty breathing, moving, and "thinking straight." He claims that the pressure put around his throat by defendant Miller[4] caused an asthma attack, which caused him to lose consciousness. He also claims that he suffered injury from hitting both of the tables, and from collapsing to the floor. Specifically, Rushing claims that the left side of his body hit the tables. He claims that he passed out after hitting the second table, and remembers waking up on the floor. Rushing attributes the alleged attack to Simpson, claiming that the other three defendants used force against him on Simpson's direct orders to "take him down." Rushing claims that he now suffers from migraines because of the incident, although he admits that he

---

[4]Rushing claims that it was defendant Easter who had an arm around his neck, but the video footage, corroborated by the affidavits of Easter and Miller, show that it was defendant Miller who was behind Rushing during the incident.

had experienced regular headaches before the incident for which he had been taking headache medicine.

Defendants argue that they thought it was necessary to remove Rushing from the dining hall because they were concerned that he might instigate a riot. Two years before the incident here, there was a riot at MSOTC. One of the individuals involved in that riot was Tim Nelson – Rushing's roommate at MSOTC. Nelson was sitting at Rushing's table on February 29, 2008. Rushing admits that Nelson, along with other detainees and residents in the dining hall, became increasingly upset during the seven minutes that defendants were asking Rushing to leave. Nelson and other individuals in the dining hall repeatedly told defendants to leave Rushing alone, and expressed anger with the situation. After the incident, Rushing was issued a conduct violation for attempting to incite a riot. There is a process at MSOTC for challenging a conduct violation if the resident believes it to be unjustified. Rushing did not challenge his conduct violation.

Rushing  has sued defendants in their individual and official capacities, asking for both compensatory and punitive damages. He also asks that I order the current Director of Mental Health to review and enforce "use of force" policies at MSOTC, and to investigate the incident and submit findings to the court.

Discussion

Rushing's claims for money damages against defendants in their official capacities are barred by the Eleventh Amendment and must be dismissed. The Eleventh Amendment presents a "jurisdictional limit on federal courts in civil rights cases against states and their employees." *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989). Defendants are employees of the state of Missouri. Accordingly, the § 1983 damage claims against defendants, acting in their official capacities, are dismissed with prejudice. *See Carter v. Hassell*, No. 4:05CV2259 DDN, 2009 WL 3762347, at *5 (E.D. Mo. Nov. 10, 2009) (dismissing damage claims against MSOTC staff, in their official capacities, based on Eleventh Amendment immunity).

Rushing's claims against defendants in their official capacities for prospective relief also fail. A state official may be sued in his or her official capacity for prospective injunctive relief, but any such claim is moot if the prisoner or detainee is no longer subject to the conditions he or she is challenging. *See Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (prisoner's claims for injunctive relief are moot if he is no longer subject to those conditions). Because Rushing is no longer a detainee at MSOTC, any claims for injunctive or declaratory relief are moot.

Rushing may, however, bring claims for monetary damages against defendants in their individual capacities. The Eleventh Amendment does not grant immunity when a § 1983 claim for damages is asserted against a state official in his or her personal capacity. *Hafer v. Melo*, 502 U.S. 21, 30-31 (1991). However, "[i]n a § 1983 action, state actors may be entitled to qualified immunity." *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009) (citation omitted). Qualified immunity may shield a government official from liability when his or her conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is a question of law, not a question of fact. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005). Issues concerning qualified immunity are thus appropriately resolved on summary judgment. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (the privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").

To determine whether defendants are entitled to qualified immunity, I consider two questions: (1) whether the facts alleged or shown, construed in the light most favorable to Rushing, establish a violation of a constitutional or statutory right; and (2) whether that right was clearly established as of February 2008, such that a reasonable official would have known that his or her actions

were unlawful.[5] *Pearson v. Callahan*, 129 S.Ct. 808, 815-16 (2009); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). Defendants are entitled to qualified immunity only if no reasonable fact finder could answer both questions in the affirmative. *Nelson v. Corr. Med. Serv.*, 583 F.3d 522, 528 (8th Cir. 2009).

Defendants are entitled to qualified immunity unless the evidence, viewed in the light most favorable to Rushing, supports a finding that their conduct in removing Rushing from the dining hall violated a constitutional right, and that constitutional right was so "clearly established" on February 29, 2008 that a reasonable staff member would have known that the conduct was unlawful. *Saucier*, 533 U.S. at 201. Rushing alleges that defendants violated his constitutional right be free from excessive force. "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). In his complaint, Rushing alleges that his Eighth and Fourteenth Amendment rights have been violated. However,

---

[5]Before the Supreme Court's opinion in *Pearson v. Callahan*, 129 S.Ct. 808 (2009), my analysis of qualified immunity was constrained by the two-step sequence set forth in *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under *Saucier*, I would first have to find that a constitutional right had been violated (as in question one here). Only after answering "yes" to question one could I then go on to ask whether that right had been clearly established at the time of the alleged violation (as in question two). In *Pearson*, the Supreme Court held that this sequence, while often appropriate, is no longer mandatory. Under *Pearson*, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S.Ct. at 818. Here, I find that it is appropriate to start with the first question, and determine whether the allegations and evidence, placed in a light most favorable to Rushing, establish a constitutional violation.

the constitutional standard applied to allegations of excessive force varies "depending on whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001). If the victim is a prisoner, the Eighth Amendment is applied, and the court must consider "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (citation omitted). If the victim is an arrestee, however, the Fourth Amendment's "objective reasonableness" standard controls. *Graham v. Connor*, 490 U.S. 386, 388 (1989). Because the arrestee has not been found guilty of a crime, the government cannot "punish" him as it might a prisoner, after an adjudication of guilt. *See Bell v. Wolfish*, 441 U.S. 520, 537-38 (1979). The evaluation of excessive force claims brought by pre-trial detainees also relies upon the objective reasonableness standard. *Andrews*, 253 F.3d at 1060. Rushing is neither an arrestee, pre-trial detainee, nor prisoner. As a detainee at MSOTC, awaiting a determination of whether he is a sexually violent predator under Missouri law, Rushing stands in a different position.

In *Andrews*, the Eighth Circuit determined that claims of excessive force brought by involuntarily committed state mental patients should be analyzed under the "objective reasonableness" standard typically applied to pretrial detainees. *Id*.

- 13 -

at 1061. I have previously held that a person involuntarily confined because there is probable cause to believe he is a sexually violent predator stands before the law in much the same way as a person involuntarily confined because there is reason to believe that he has committed a crime. *Fogle v. Blake*, No. 4:06CV595 CDP, 2007 WL 2908001, at *3 (E.D. Mo. Oct. 2, 2007) (citing *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005) (status of a detainee awaiting a civil commitment trial under Illinois Sexually Violent Persons Act found comparable to that of a pretrial detainee)). Thus, the rights of pretrial detainees serve as a guide to determining the rights of a civil detainee such as Rushing.

Because Rushing was a detainee at MSOTC, his allegations of excessive use of force are analyzed under the "objective reasonableness" standard of the Fourth Amendment, rather than the Eighth Amendment. Under this standard, the use of force must be necessary to achieve a legitimate institutional interest, such as safety, security, or efficiency. *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989). The amount of force used must not be in excess of that reasonably believed necessary to achieve those goals. *Id*. The relevant inquiry is whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances

that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. In determining whether excessive force was used, I should consider: (1) whether there was a need for the application of force; (2) the relationship between any such need and the amount of force used; (3) the extent of any injury inflicted; (4) whether the force was used for punishment or instead to achieve a legitimate purpose such as maintaining order or security; and (5) whether a reasonable officer on the scene would have used such force under similar circumstances. *Andrews*, 253 F.3d at 1061 n. 7 (citing the "Eighth Circuit Model Instruction 4.20 on Excessive Use of Force - Pretrial Detainees - Fifth and Fourteenth Amendments" as the appropriate instruction for an objective reasonableness standard to be applied to excessive force claims brought by pre-trial detainees).

Defendants argue that they are entitled to qualified immunity because the force they used was necessary to maintain and restore discipline. Defendants were aware that a riot had previously occurred at MSOTC, and they were aware that Tim Nelson, Rushing's roommate and tablemate that morning in the dining hall, had been a participant in that riot. They repeatedly asked Rushing to peacefully return to the housing ward. Rushing repeatedly refused. Rushing does not deny that the other individuals at his table, and throughout the dining area, became

increasingly upset with the situation, and began to make comments to both him and to the staff.

Other courts in this circuit have found that the use of force against a detainee was reasonable when the detainee refused to comply with an order.  In *Mahamed v. Anderson*, No. 07-4815 ADM/FLN, 2009 WL 873534 (D. Minn. Mar. 30, 2009), the court found that handcuffing and pushing a detainee into a wall, and then holding him down on the floor by placing a knee into his back, was not excessive force under the Fourth Amendment.  The detainee in *Mahamed* was ordered by jail staff to go to lockdown, and he refused.  *Id.* at *3.  The jail staff handcuffed him, twisted his wrist, and walked him towards segregation.  *Id.*  The detainee yelled at the jail staff, and the staff pushed him into a wall and ordered him onto his knees and stomach.  *Id.*  A staff member caused the detainee to vomit by placing his knees into his back.  *Id.*  After the incident, the detainee could not sleep, had trouble breathing, had pain in his head, wrists, shoulders and back, and experienced flashbacks from past traumatic events.  *Id.*

The court in *Mahamed* found that the use of force by the jail staff was objectively reasonable because the detainee had refused to comply with jail staff orders.  *Id.*  Similarly, Rushing's refusal to leave the dining area, after almost seven minutes of being asked to do so by multiple staff members, justified the use of force in this case.  *See also Foster v. Metro. Airports Comm'n*, 914 F.2d 1076,

1082 (8th Cir. 1990) (officer's use of force in pulling the plaintiff out of his car, when plaintiff refused to exit car, was reasonable); *compare Carter*, 2009 WL 3762347, at *6 (denying qualified immunity where MSOTC resident was hit by a staff member during a fight, where the resident did not resist MSOTC officials, participate in the fight, or pose any safety threat) *with Blount v. Echols*, No. 07-5046, 2008 WL 4368936, at *8 (W.D. Ark. Sept. 24, 2008) (finding no excessive force where a pretrial detainee was pinned against a wall by prison staff because the detainee refused to comply with staff orders to move to the back of his cell, finding that "given [the pretrial detainee's] failure to obey the orders of the deputies, application of some force was reasonable.").

Two recent Eighth Circuit cases have held that the opportunity to comply with an order is a key moment in Fourth Amendment excessive force analysis. In *Smith v. Kansas City, Missouri Police Department*, No. 09-1484, 2009 WL 3713701 (8th Cir. Nov. 9, 2009), the Eighth Circuit upheld a denial of qualified immunity where an arresting officer did not give an arrestee any opportunity to comply with his commands before using force. In *Smith*, the officer grabbed and handcuffed a suspect without any oral warning and without provocation. *Id*. at *4. The officer then shoved the suspect's face into concrete, and placed his knees into the suspect's back. *Id*. at *1. Unlike here, the plaintiff in *Smith* never resisted the officer's commands, and was not given a chance to do so.

In *Rohrbough v. Hall*, No. 08-3617, 2009 WL 3713703 (8th Cir. Nov. 9, 2009), the Eighth Circuit affirmed the denial of qualified immunity where an arrestee complied with the officer's order to stop, and did not resist or evade arrest, before the officer shoved him and punched him in the face. Again, unlike here, the plaintiff in *Rohrbough* was not given an opportunity to comply with any orders before force was used. *Id.* at *2. Refusal to comply with an officer's orders, when given an opportunity to do so, makes the officer's use of force more reasonable. *See Spoo v. Maciejewski*, No. 02-CV-4255 JMR/FLN, 2004 WL 2457859 (D. Minn. Oct. 14, 2004) (granting summary judgment on qualified immunity grounds to officer who clothes-lined and repeatedly punched a student who had refused to leave a scene after the officer asked him to, and who had asked for the officer's badge number). Here, Rushing refused to comply with defendants' orders to return to the dining hall for seven minutes.

The amount of force used by defendants was also reasonable, in light of defendants' interest in maintaining discipline and order. In *Mahamed*, the officers pushed the detainee into a wall, and applied so much pressure on his back as to make him vomit. In *Blount*, the detainee was slammed against his cell wall. In both cases, the court granted qualified immunity to the acting officers. Defendants Miller, Easter, and Major applied much less force than the officers in *Mahamed* and *Blount*. Rushing's allegations, and the video footage, establish that the force

- 18 -

used by defendants was limited to: (1) defendant Easter grabbing his right arm; (2) defendant Miller putting him in a choke-hold; (3) defendant Major grabbing his left arm; and (4) all three defendants moving him as he struggled, causing contact with two tables and eventually the ground. This is a reasonable amount of force to use to accomplish the objective of removing Rushing from the dining hall.

Rushing's injuries were minimal, if any. The extent of the injury is relevant to the reasonableness of the force used. *Patzner v. Burkett*, 779 F.2d 1363, 1371 (8th Cir. 1985); *see also Blount*, 2008 WL 4368936, at *8 (pretrial detainee's lack of any visible injury and his failure to seek medical treatment was relevant to the excessive force inquiry). The Eighth Circuit has said that "[i]t remains an open question . . . whether an excessive force claim requires some minimum level of injury," *Hunter v. Namanny*, 219 F.3d 825, 831 (8th Cir. 2000), but it has also held that a "de minimis use of force or injury is insufficient to support a finding of a constitutional violation." *Crumley v. City of St. Paul, Minn*., 324 F.3d 1003, 1007 (8th Cir. 2003). The Eighth Circuit has further held that the "temporary and slight aggravation of pre-existing conditions" are "precisely the type of de minimis injuries that preclude a claim for excessive force." *Andrews v. Fuoss*, 417 F.3d 813, 818 (8th Cir. 2005). The injuries allegedly suffered by Rushing were (1) an asthma attack caused by the choke-hold; and (2) migraines from either the asthma attack or from contact with the ground. While Rushing claims that he sustained

injuries from being slammed into two tables, forcing them to collapse, the video footage of the incident contradicts that account.

These injuries are "temporary and slight aggravation[s] of pre-existing conditions" that would preclude a claim for excessive force. Rushing admits that he suffered from regular headaches before the incident, and he has not sought medical attention for the alleged migraines after the incident. *See, e.g. Blount*, 2008 WL 4368936, at *8 (detainee's failure to seek medical help for his alleged injuries held to contradict his statements regarding the amount of force used against him during incident with prison staff). He has no medical evidence to support an injury from making contact with the two dining hall tables, and the video footage shows that any contact with those tables was slight. His asthma attack was temporary, and he has not suffered any permanent damage as a result.

After considering all the circumstances present here, I find that defendants acted reasonably in using force to remove Rushing from the dining hall after he refused to comply with orders to leave. Rushing was given ample opportunity to leave, and his injuries, if any, were minimal. Further, defendants' use of force was reasonable in light of their legitimate interest in preventing the situation from escalating to a riot. I find that a reasonable officer, presented with the circumstances here, could have concluded that the amount of force used against Rushing to remove him from the dining hall was necessary. Because I find that

defendants did not violate Rushing's constitutional right to be free from excessive

force, I do not need to consider whether that right was clearly established at the

time of the incident. No reasonable fact finder could find that the facts alleged or

shown, construed in the light most favorable to Rushing, established a violation of

a constitutional or statutory right. Accordingly, defendants are entitled to

qualified immunity on Rushing's federal claims.

Rushing's State Law Claims

Rushing also alleges that defendants violated the Missouri Department of

Mental Health's Operating Regulations which prohibit "neglect" and "physical

abuse." He also alleges that defendants threatened and intimidated him in

violation of those regulations. A violation of these regulations, even if established

by Rushing, is not actionable under federal law. The regulations do not create a

basis for liability under § 1983 because "a violation of state law, without more,

does not state a claim under the federal Constitution or 42 U.S.C. § 1983." *Marler*

*v. Mo. State Bd. of Optometry*, 102 F.3d 1453, 1457 (8th Cir. 1996) (citation

omitted).

To the extent that Rushing's complaint may be considered to allege state

law causes of action, and without addressing the adequacy of these potential

claims, I decline to exercise jurisdiction over them. Generally, this Court only has

jurisdiction to adjudicate claims based on either federal subject matter jurisdiction

or diversity jurisdiction. 28 U.S.C. §§ 1331 & 1332. However, a "federal court has jurisdiction over an entire action, including state-law claims, whenever the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988) (citation omitted); *see also* 28 U.S.C. § 1367. Upon a determination that defendants are entitled to summary judgment on plaintiff's federal claims, I have discretion to dismiss without prejudice plaintiffs' attendant state law claims. *See Miner v. Local 373*, 513 F.3d 854, 866 (8th Cir. 2008). In my discretion, I will dismiss plaintiffs' state law claims without prejudice.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment [#55] is granted. Plaintiff's federal claims are dismissed with prejudice. Plaintiff's state law claims are dismissed without prejudice.

**IT IS FURTHER ORDERED** that defendants' motion for leave to supplement [#68] is granted.

**IT IS FURTHER ORDERED** that defendants' motion to disregard statements or for sanctions [#73] is denied.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 11th day of December, 2009.